**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| **ELYSE HAWTHORNE** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.   3:20-cv-584** |
| | ) | |
| **JAMES RIVER PETROLEUM, INC.** | ) | **TRIAL BY JURY DEMANDED** |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

COMES NOW Plaintiff Elyse Hawthorne ("Plaintiff" or "Hawthorne"), by counsel, and alleges as follows against Defendant James River Petroleum, Inc. ("Defendant" or "JRP"):

### PRELIMINARY STATEMENT

1.     This is an action pursuant to the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*, as amended by the Emergency Family and Medical Leave Expansion Act ("EFMLEA"), 29 U.S.C. §§ 2612(a)(1)(F) *et seq.*, to correct and remedy the unlawful employment practices complained of herein.

2.     Plaintiff was employed by JRP as the company's Risk Manager until her unlawful termination from employment while on job-protected FMLA/EFMLEA leave.

### JURISDICTION AND VENUE

3.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 2617(a)(2).

4.     Venue is proper for this Court pursuant to 28 U.S.C. § 1391 and Local Rules 2(a)(7) and 2(b), as the employment practices alleged herein to be unlawful were committed within the Eastern District of Virginia and this Division.

## PARTIES

5.      Plaintiff Elyse Hawthorne is a citizen of the United States and a resident of Hanover County, Virginia. Plaintiff was employed by JRP and an eligible employee within the meaning of 29 U.S.C. § 2620(a)(1)(A) at all times relevant hereto.

6.      Defendant James River Petroleum, Inc. is a fuel delivery and logistics company incorporated in Virginia and based in Hanover County, Virginia that services clients across the U.S. JRP employs fewer than 500 employees and has employed 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year. JRP is an employer within the meaning of 29 U.S.C. § 2620(a)(1)(B) and 29 U.S.C. § 2611(4).

## FACTUAL ALLEGATIONS

**The COVID-19 Pandemic**

7.      On or about March 12, 2020, Virginia Governor Ralph Northam declared a public health emergency in the Commonwealth of Virginia due to the COVID-19 pandemic.

8.      On or about March 18, 2020, Hanover County closed its schools due to the COVID-19 pandemic.

9.      On or about March 23, 2020, Governor Northam issued an Executive Order closing Virginia public schools for the remainder of the 2019-2020 school year due to the public health emergency caused by the COVID-19 pandemic.

10.     Meanwhile, recognizing the tremendous strain school closures would put on working parents, the U.S. Congress passed the Family First Coronavirus Response Act ("FFCRA"), which President Trump signed into law on March 18, 2020. The FFCRA contains the EFMLEA which amends the FMLA to guarantee eligible employees paid and job-protected leave

to care for children whose school or primary place of care was closed or unavailable due to the COVID-19 pandemic. The FFCRA and EFMLEA provisions went into effect on April 1, 2020.

**Hawthorne's Employment with JRP**

11.     In April 2019, Hawthorne was recruited by Prime Legal to be placed in a Contract Administrator Position with JRP as a contractor. After successfully performing the role for approximately two months, JRP hired Hawthorne as a full-time employee in July 2019, gave her a substantial raise, and changed her title to Risk Manager.

12.     Hawthorne initially reported to Brandon Ogilvie, CFO, but in approximately December 2019 began reporting to the recently hired Controller, Allison Berry.

13.     JRP's Employee Handbook provides that employees will be subject to 60-day performance reviews and that JRP issues written "warnings" when an employee's performance is unacceptable. Plaintiff did not receive a 60-day performance review, nor any written performance review, during her employment with JRP and was never subject to a written "warning" for unacceptable performance. Plaintiff consistently received accolades for her job performance from the attorneys working on JRP matters and from her JRP colleagues and supervisors.

14.     Plaintiff consistently performed her work at a satisfactory or above level and met or exceeded JRP's legitimate business expectations of her.

**Hawthorne's Need for EFMLEA Leave**

15.     Hawthorne has two children that attend elementary and middle school at Hanover County public schools. Plaintiff is divorced from her children's father and she is the primary caregiver for the children during the school week during the school year.

3

16.     When her children's schools initially closed due to COVID-19 on March 18, Hawthorne did her best to juggle childcare with her ex-husband, ex-stepmother-in-law, and ex-mother-in-law, while also reporting to work.

17.     Hawthorne requested to work from home, but her request was denied by JRP and she was told she was required to continue to report to work at the office during the pandemic.

18.     On information and belief, two other JRP employees (one in billing and one in collections) were forced to resign in late March because they could not find childcare coverage after the school closures and/or had family members at high-risk for COVID-19 and JRP would not allow them to work from home.

19.     Even when Hawthorne came down with COVID-19 symptoms in mid-March and her doctor recommended she stay out of work for a minimum of three days, as a precaution, JRP refused to allow her to stay home and required her to return to the office.

20.     It soon became clear to Hawthorne that alternative childcare arrangements were untenable for her and her children and she would need to stay home during the week with her children to care for them and continue their education during the immediate schools closure.

21.     On March 31, 2020, JRP's Human Resources Director, Danielle Conner, sent a company-wide email regarding the FFCRA. The email attached a FFCRA poster provided by the Department of Labor explaining, among other things, the newly enacted right to job-protected leave to care for children due to school closures. The email also purported to include JRP's new FFCRA leave request form, but the e-mail did not actually include the attachment. Hawthorne followed-up with HR hours later, by email, requesting the FFCRA leave request form and was provided same.

**Hawthorne's Request for EFMLEA Leave and JRP Interference with Same**

22.     The next morning, Wednesday April 1, Hawthorne submitted the FFCRA leave request form to care for her children to her immediate supervisor, Ms. Berry, who signed-off on the request. However, when Hawthorne then brought the form to Ms. Conner, the HR director and a required signatory, Ms. Conner would not accept it and stated that she would speak to Mr. Ogilvie (CFO) and Ms. Berry to discuss other options that may available rather than Hawthorne going on leave, as permitted by federal law. Hawthorne was stunned but initially agreed to hold-off on formally submitting the leave request.

23.     Later that day, Hawthorne was called into Ms. Berry's office. Present were Ms. Conner, Ms. Berry, and Mr. Ogilvie. The JRP management members aggressively questioned Hawthorne about her childcare options and lack of support network, told her again that remote work was not an option, and suggested that her job could be in jeopardy if she took the leave. When they tried to dissuade Hawthorne from taking the leave by indicating her pay would be cut to 2/3 (consistent with the law), she responded she would be able to supplement her pay reduction by continuing her remote ESL teaching job, which she did in the evenings and on the weekends (and was consistent with JRP's outside employment policy).

24.     Hawthorne considered JRP management's request but concluded there was no viable childcare alternative other than staying at home to care for her children. She therefore submitted the FFCRA leave request form again, this time in writing (by email), to Ms. Conner later in the evening on Wednesday April 1. Hawthorne requested leave beginning Monday April 6 through an estimated end date of June 10, 2020.

25.     The very next day, Thursday April 2, JRP's owner and CEO, Lloyd Little, stormed into Hawthorne's office, accused her of abandoning the company by submitting a leave request,

and stated that JRP could not allow her to go out on leave as soon as Monday. Desperate to appease the company owner and keep her job, Hawthorne agreed to push her leave start date back a week to April 13 if she could work from home the following week, starting April 6, so that she could also care for her children and assist with their school work.

26.     Mr. Little reluctantly agreed. Ms. Hawthorne sent a follow-up email to Mr. Little confirming the work arrangement for the following week and the agreement that her leave would now begin April 13. Hawthorne also requested from Mr. Little a signed document stating that FMLA job protections would apply starting April 6, the originally requested leave start-date.

27.     The next day, Friday April 3, Hawthorne had not received the requested document confirming FMLA protections and approached Mr. Little in his office. Mr. Little responded by directly threatening her job due to the leave request, telling Hawthorne, "I can't promise I'm not going to fire you, I need someone in that office;" "I can [only] guarantee you two weeks [of leave]" and "I won't block unemployment." Hawthorne told Mr. Little she had a right to the leave and did not have any other viable childcare options.

28.     After the meeting, because Mr. Little refused to put anything in writing, Hawthorne returned to her office and wrote down what Mr. Little had told her. She took her notes directly to HR Director, Ms. Conner, showed them to her, and explained her fear of retaliation from Mr. Little to Ms. Conner. Hawthorne requested that Ms. Conner, in her role as HR Director, take steps to prevent Mr. Little from terminating her employment, and interfering with her leave, as he had just threatened to do. Ms. Conner took a picture of Hawthorne's notes with her phone and told her "if anything does happen to your job, you would have every right to file a complaint with the Department of Labor. If you do, I'll tell Lloyd [Mr. Little] that he will need to hire an attorney to deal with it because I'm not a lawyer and he will lose."

**JRP Continues Their Campaign of Interference and Retaliation**

29.     Hawthorne worked from home the week of April 6 as agreed. On Tuesday April 7 she received the completed leave forms from the HR Director, Ms. Conner, providing her with job-protected leave from April 13 through June 10.

30.     On Thursday April 9, JRP sent Hawthorne the company's newly revised "Outside Employment Policy." The new policy, for the first time, prohibited outside employment while an employee was out on FMLA leave.

31.     On information and belief, the new policy was specifically targeted at Hawthorne and in retaliation for her use of leave after she advised JRP management the week prior that she may supplement her leave-reduced pay with her outside employment during evenings/weekends.

32.     To comply with the new policy, Hawthorne elected not to continue her outside employment while on leave and therefore lost income. On information and belief, Hawthorne was the only JRP employee adversely effected by the new policy.

33.     On Friday, April 10, Ms. Berry called Hawthorne and requested that she come into the office the following week during business hours (while Hawthorne was on leave), instead over the weekend as they had previously arranged, to review documents in her office and discuss work transition items. Ms. Berry advised that she had been instructed by Mr. Little to not allow Hawthorne in the office unsupervised (Hawthorne had previously worked numerous weekends in the office alone). Hawthorne replied that she could not leave her children at home during the school/work week. Ms. Berry and Hawthorne eventually agreed to meet at the office on Easter Sunday, April 12.

34.     When Ms. Berry and Hawthorne met at the office, they initially discussed work transition items. However, when the discussion turned to Hawthorne's leave and Mr. Little's

reaction, Ms. Berry advised Hawthorne to "look [for another job] while out [on leave]" and that Hawthorne should not trust Mr. Little because he was upset Hawthorne was taking two months of leave and "I'm sure he [Mr. Little] will try to find some kind of way to screw you." At the conclusion of the meeting, Ms. Berry instructed Hawthorne to remove her personal items from her office and return her keys, a clear indication that JRP had already been made the decision that Hawthorne would not be allowed to return to work.

35.     Following the April 12 meeting and Ms. Berry's warning, Hawthorne next heard from Ms. Berry in early May to set another call to discuss work transition items. During that call on May 7, Ms. Berry raised, for the first time, the status of several outstanding work items.  On information and belief, Ms. Berry was instructed to raise these fabricated concerns by Mr. Little and/or Mr. Ogilvie.  During her employment, Hawthorne had kept the senior management team advised of her key projects with weekly status reports and had not been advised of any concerns regarding the items mentioned on the May 7 call. Hawthorne explained to Ms. Berry the status and history of each item on the May 7 call.

**JRP Terminates Hawthorne's Employment While on Leave**

36.     On May 22, while still on leave, Hawthorne received a letter by e-mail from JRP stating that her employment would be terminated June 10 (her expected return to work date) and offering a 2 week severance payment in exchange for Hawthorne's release of claims against JRP.

37.     Hawthorne responded to the letter in writing on May 27 and requested that she be allowed to return to work, consistent with federal law. JRP denied her request. Hawthorne refused to sign the release agreement and her employment was terminated effective June 10.

38.     Hawthorne has suffered damages, including lost wages and benefits, as a result of JRP's knowing and willful interference with her job-protected FMLA/EFMLEA leave and

knowing and willful retaliation for her use of job-protected FMLA/EFMLEA leave and opposition to practices made unlawful by the FMLA/EFMLEA.

## COUNT I
## FMLA/EFMLEA Interference

39.     Plaintiff incorporates by reference and re-alleges the proceeding paragraphs as though fully set forth herein.

40.     Plaintiff had a right to job-protected qualifying leave related to a public health emergency and sought to exercise same pursuant to the FMLA/EFMLEA. Plaintiff had a right to reinstatement following her FMLA/EFMLEA leave.

41.     Defendant interfered with Plaintiff's use of FMLA/EFMLEA leave in violation of 29 U.S.C. § 2615(a)(1) by denying her reinstatement to her position held prior to the leave and terminating her employment.

42.     As a direct and proximate result of Defendant's unlawful interference, Plaintiff has suffered and will continue to suffer injury and damages including, but not limited to, loss of wages and salary, loss of employment benefits, inconvenience, mental anguish, litigation expenses (including attorneys' fees), consequential damages, and other injury.

43.     Defendant's actions described herein were willful and were committed in knowing violation of Plaintiff's rights and/or were done with reckless disregard for same.

## COUNT II
## FMLA/EFMLEA Retaliation

44.     Plaintiff incorporates by reference and re-alleges the proceeding paragraphs as though fully set forth herein.

45.     Plaintiff had a right to job-protected qualifying leave related to a public health emergency and sought to exercise same pursuant to the FMLA/EFMLEA.

46.     Defendant retaliated against Plaintiff for opposing practices made unlawful by the FMLA/EFMLEA, and exercising her substantive rights under same, in violation of 29 U.S.C. § 2615(a)(2) by enacting a discriminatory outside employment policy, denying her reinstatement to her position held prior to the leave, and terminating her employment.

47.     As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff has suffered and will continue to suffer injury and damages including, but not limited to, loss of wages and salary, loss of employment benefits, inconvenience, mental anguish, litigation expenses (including attorneys' fees), consequential damages, and other injury.

48.     Defendant's actions described herein were willful and were committed in knowing violation of Plaintiff's rights and/or were done with reckless disregard for same.

**WHEREFORE** Plaintiff Elyse Hawthorne requests judgment against Defendant James River Petroleum, Inc. as follows:

A.     For appropriate declaratory relief declaring the acts and practices of JRP complained of herein in violation of the FMLA/EFMLEA;

B.     For an award of actual damages including the value of lost wages and employment benefits, with interest at the prevailing rate;

C.     For an award of liquidated damages equal to the sum of the amount of actual damages;

D.     For equitable relief including reinstatement, or front pay in lieu of same;

E.     For an award of reasonable attorneys' fees and costs, including expert witness fees expended; and

F.     For such other and further relief to which Plaintiff may show she is justly entitled.


**TRIAL BY JURY IS DEMANDED**

Respectfully submitted,

ELYSE HAWTHORNE


_/s/ *Paul M. Falabella*_____

Harris D. Butler, III (VSB No. 26483)
Paul M. Falabella (VSB No. 81199)
BUTLER ROYALS, PLC
140 Virginia Street, Suite 302
Richmond, Virginia 23219
Telephone: (804) 648-4848
Facsimile: (804) 237-0413
Email: harris.butler@butlerroyals.com
          paul.falabella@butlerroyals.com